## Hignite v. Nantz.

(Decided May 11, 1934.)

J. R. LLEWELLYN for appellant.

L. C. LITTLE and G. I. RADER for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

In May, 1932, the appellant, J. L. Hignite, filed suit in the Jackson circuit court against J. M. Hignite and J. C. Nantz as partners, operating under the business name of Hignite & Nantz, upon the following note:

"McKee, Ky.   Dec. 29-1923.

"Three months after date we or either of us promise to pay to J. L. Hignite or order the sum of Fourteen Hundrey Seventy One Dollars and eighty five cents [$1,471.85] for value received of him in Gen. Mdse. with Int. 8% from date until paid.

'Hignite.& Nantz."

The plaintiff by his petition alleged that the note was executed to him by J. M. Hignite for the partnership for goods and merchandise sold to Hignite & Nantz while conducting their partnership business in the summer of 1921.

The defendant J. M. Hignite, sued as one of the partners of the firm, did not answer or make defense, though the codefendant, J. C. Nantz, did resist the suit, filing a separate answer, whereby he denied that the merchandise, for which it was alleged the note sued on

was executed, was sold to J. M. Hignite and J. C. Nantz as a partnership, or at all, or sold it while it was operating as such, or that he was then, or had ever been, a member or partner of the alleged partnership.

Plaintiff filed an amended petition, alleging that the defendants, J. M. Hignite and J. C. Nantz, had formed a partnership for the purchase and sale of merchandise on about May 25, 1921, and had continued as such throughout the years 1921, 1922, and 1923, and that he had sold it the goods for which the note sued on was given while it continued in business as a partnership through such period.

To this pleading a separate amended answer was filed by Nantz, wherein he alleged that the note sued on and alleged to have been executed by his codefendant, J. M. Hignite, on December 29, 1923, was executed by Hignite more than two years after the alleged partnership of Hignite & Nantz, if any there ever was, had been dissolved and more than two years after the business had ceased, and that the plaintiff, J. L. Hignite, secured the note from his father, J. M. Hignite, with full knowledge of this fact, and that it was not a valid or binding note against the defendant J. C. Nantz.

An agreed order, controverting the affirmative allegations of this pleading, was filed, completing the issues, when the case came on for trial before a jury, which, after hearing proof and receiving the instructions of the court, returned a verdict in favor of the defendant, upon which judgment was accordingly entered.

The court having refused plaintiff a new trial, he prosecutes this appeal, seeking a reversal of the judgment, wherein, among other assignments of error, he mainly argues and insists as grounds for its reversal that the court erred both in its instructions given the jury and in the admission of incompetent character evidence.

The facts as disclosed by the record are substantially as follows:

The defendant J. M. Hignite and his son, the appellant, J. L. Hignite, were in 1921 associated and engaged in the mercantile business at McKee, Jackson county, Ky., when J. M. Hignite desired to establish a branch business at a lumber camp near McKee, and to such end spoke to the codefendant, J. C. Nantz, his kinsman and

uncle, about joining with him in establishing the proposed mercantile business there as a partnership undertaking.

J. M. Hignite testified that Nantz had favorably acted upon his suggestion and entered into the proposed partnership with him, and that, pursuant to such agreement, a small store was built for them near the lumber camp and a contract made with his son, J. L. Hignite, to buy and deliver to them the desired goods and merchandise required in their operation of the new partnership business, while also buying for the like business owned and operated by himself and father at McKee.

It is admitted that it was by the defendants agreed that Johnny Cottriel, the adopted son of the defendant Nantz, would be employed upon a sales commission basis to run this new business, whatever its character, whether a partnership or not.

Nantz testified that while J. M. Hignite proposed to him that they enter into a partnership agreement for the establishment of this branch store, he declined to go into the venture and never at any time had acquired any interest in the said business, as a partner or otherwise, though he stated that Johnny Cottriel, or Nantz, as he was called, had been employed by Hignite upon his recommendation to manage the branch store, and that he did so for the brief period of some two or three months during the summer of 1921, when, as it is admitted, the venture proving unprofitable, it was closed down and the merchandise then on hand in the store removed and carried back by J. L. Hignite to his McKee store.

Shortly after this dissolution of the partnership, if any there was, or the termination of the camp store business, whatever its character, the plaintiff wrote Nantz at his home in Madison county, submitting him a bill for the alleged partnership's indebtedness to him for merchandise sold it, amounting to some several hundred dollars, which he claimed Nantz owed him as representing one-half the balance due him upon account for goods and merchandise sold and delivered by him to the firm of Hignite & Nantz, while operating its business in 1921 at the lumber camp.

Nantz denied liability upon the alleged firm's indebtedness, either as a partner or otherwise, and, claim-

ing that he was being "framed" by his kinsmen, the Hignites, refused payment.

It appears that thereafter appellant's father, J. M. Hignite, according to his testimony, made one or two trips to Richmond to confer with Nantz about their paying his son's account, and told him that his son, the appellant, had grown impatient with their delay in paying him and was threatening to bring suit against them for the recovery of the amount owing him for the merchandise sold them, unless its payment or some settlement was at once arranged for.

The father further testified that his codefendant Nantz, when informed that he was threatened with suit, replied that he did not then have the ready money with which to pay the account, but requested and instructed him to see if the suit against them might not be averted by giving appellant a note for the amount claimed owing him, and directed him, if it could be so arranged, to execute him their note therefor; that, pursuant to such instruction, he did soon thereafter, although it was then some two years after the alleged partnership business had closed down and been dissolved, execute to the appellant the partnership note of Hignite & Nantz, here sued on, in satisfaction of its account owing plaintiff.

The defendant Nantz denies that any such conference took place or that such or any authority was given the defendant Hignite to execute for the alleged partnership this note or that he knew anything whatever about its execution by Hignite to his son, the appellant.

Further, it is complained that the court permitted the defendant to introduce in evidence and read to the jury the depositions of several witnesses deposing that his general reputation "for honesty and fair dealing" was good, although the same was inadmissible, in that no attempt had been made to impeach the character of the defendant.

Upon this summary of the pleadings and evidence it is manifest that the only questions here presented for our review upon this appeal are: (1) Whether or not defendant authorized and instructed his codefendant, J. M. Hignite, to execute to appellant the partnership note in question, in December, 1923, or some two years after this alleged partnership business (whether such in fact or not) had been, it is admitted, dissolved or closed

down; and (2) whether or not the admission of the alleged incompetent character evidence in behalf of the defendant, before his character had been attacked, constituted a reversible error as one substantially prejudicial.

We will now turn our consideration to a discussion and disposition of the first point.

It may be conceded that the general rule of law is well settled as that of this state to the effect that, after the dissolution of a partnership, one partner cannot bind the other by the execution of a note given for prior partnership debts, nor has a partner any authority by implication to bind his copartner, after dissolution of the partnership and notice thereof, by executing a note in the firm name, even though executed for a firm debt. Mullins, etc., v. Simpkinson, 10 Ky. Law Rep. 280. This rule is thus stated in 47 C. J. sec. 797, p. 1127: ·

"After dissolution, no partner has the implied power to sign the partnership name so as to bind the other partners, even, according to some cases, for the purpose of liquidating firm affairs; but such power may be expressly conferred."

And further, in the same text, at section 803, it is stated:

"The dissolution of a partnership terminates the implied authority of each partner to enter into new obligations on behalf of the firm or of his copartners, and the fact that the dissolved firm's affairs have not been settled will not authorize exercise of this power."

And again, in section 804 of the same text, it is stated:

"It necessarily follows from the principles above stated that after the dissolution of a partnership neither partner has implied authority to bind the firm or his copartners by making, renewing, or indorsing negotiable paper in the firm name, and this is true, even though the obligation be given for a firm debt. * * *"

To like effect also is it stated in Cronly v. Bank of Kentucky, 18 B. Mon. 405, wherein the court, at page 409, uses this language:

"By virtue of the partnership, one partner is constituted an agent for another, as to all matters within the scope and objects of the partnership business in which they are engaged. * * *

"For what length of time was this authority to continue? As the power created by the partnership ceases when the partnership is dissolved, the enlargement of that power would seem necessarily to cease and determine at the same time. * * * An authority by a firm carries with it an implied limitation of its existence, its duration being necessarily confined to the continuance of the partnership by which it was created."

In the case of Merrit v. Pollys, 16 B. Mon. 355, the court elaborated the same rule in these words:

"The doctrine is well settled, that after a partnership has been dissolved, and legal notice of the dissolution has been given, one partner cannot bind his co-partners by the execution of a note, or any other instrument of writing which creates a new cause of action, even for the renewal of a partnership note, or the settlement or liquidation of a partnership account. Abet v. Sutton, 3 Esp. 108; Wrightson v. Pullam, 1 Starkie, 375; Sanford v. Mickles, 4 Johns. [N. Y.] 224; Bank of South Carolina v. Humphreys, 1 McCord [S. C.] 388; Bell v. Morrison, 1 Pet. 351 [7 L. Ed. 174]; National Bank v. Norton, 1 Hill [N. Y.] 572."

See, also, Sandford v. Sandford, 6 Ky. Op. 218 and Daniel v. Nelson, 10 B. Mon. 316.

It is here shown by the evidence, without contradiction, that the appellant knew of the closing down or dissolution of the alleged partnership business and that the same took place some two years before his father, the defendant J. M. Hignite, executed him its note in 1923 in liquidation of its debt claimed owing appellant for merchandise sold it while operating the business in 1921. It therefore necessarily follows that plaintiff, having knowledge of such fact, cannot recover against the alleged copartner, Nantz, upon the note, executed him under such circumstances, without first showing that its execution to the appellant as a partnership obligation was at such time authorized and directed by the defendant Nantz. The evidence tending to show such au-

thorization by Nantz of his alleged co-partner Hignite's executing the note was properly considered the only evidence, under the facts here shown, calling for an instruction covering it, whereby the jury could be permitted to find for the appellant should they believe from the evidence that such authorization was in fact given by Nantz. This the court we are of the opinion did under its given instructions Nos. 1 and 3, whereby the jury was told, in substance, by the first that, if the defendant Nantz in December, 1923, instructed J. M. Hignite to make settlement with the said J. L. Hignite for the merchandise furnished Hignite & Nantz and to execute a partnership note for the amount of same, and that, pursuant to such instruction, the note sued on was executed and delivered to the plaintiff, they should in such event find for the plaintiff; otherwise they should find for the defendant. Also by instruction No. 3 the jury was directed that, even should they believe from the evidence that Nantz and Hignite had entered into a mercantile partnership and had purchased the merchandise from the plaintiff, yet, if they believed from the evidence that Hignite had executed therefor the note sued on after Hignite & Nantz had ceased to carry on the merchandise business, and that the note was executed without the knowledge and instruction of the said Nantz to execute it, they should find for Nantz.

These instructions we are of the opinion fairly covered the only evidence upon which, under the law of the case as stated, the appellant was entitled to recover from the defendant Nantz; and, the jury having found from the evidence, under these proper instructions of the court covering it, for the defendant, or, in effect, found that the appellee Nantz did not authorize Hignite to execute the note, the appellant is without meritorious grounds to complain of prejudice by its finding.

Appellant next urges that the court prejudicially erred in permitting the defendant to introduce incompetent character evidence to show that his general reputation in his community for honesty and fair dealing was good.

Section 599 of the Civil Code of Practice provides that:

> "Evidence of the good character of a witness is inadmissible until his general reputation has been impeached."

This section is held to apply to parties the same as to other witnesses in declaring that evidence of good character is inadmissible until after his character has first been attacked or unless the proceedings are such as to put the character of the party directly in issue. Evans v. Evans, 93 Ky. 510, 20 S. W. 605, 14 Ky. Law Rep. 628; Colker v. Conn. Fire Insurance Co., 224 Ky. 837, 7 S. W. (2d) 502, 506. In the latter case this court said:

"The general rule is that evidence of general good character is inadmissible in a civil action in which a party is charged by inference with wrongdoing. 10 R. C. L. 950, sec. 119. In Morris v. Hazelwood, 1 Bush [Ky.] 208, the defendant claimed, when sued for money intrusted to him, that he had been robbed of the money and introduced proof of former good character for the purpose of sustaining his defense. This was held error on the ground that the pleadings put in issue a fact, not character. In Evans v. Evans, 93 Ky. 518, 20 S. W. 607, 14 Ky. Law Rep. 628, the rule was thus stated:

" 'In civil actions evidence of general reputation is not admissible unless the proceeding be such as to put the character of the party directly in issue.'

"In Mattingly v. Shortell, 120 Ky. 52, 85 S. W. 215, 27 Ky. Law Rep. 426, 8 Ann. Cas. 1134, the plaintiff, as a bookkeeper, had made entries in the books which his employer said were false. It was held that evidence of the bookkeeper's good character was inadmissible."

In 10 R. C. L. sec. 117, p. 947, this rule regulating the introduction of such evidence is there discussed and stated as follows:

"The general rule in civil actions unquestionably is that the general character of the parties is not involved in the issue, and evidence concerning it is not admissible. Evidence of character is uncertain in its nature, because true character is ascertained with difficulty, and those who are called to testify are reluctant to disparage the influential and often too willing to disparage one under a cloud. At best, such evidence is a mere matter of opinion, and, in matters of opinion, witnesses are apt to be influenced by prejudice or partisanship of which they

may be unconscious, or by the opinions of those who first approach them on the subject. The introduction of such evidence, in civil cases, to bolster the character of parties and witnesses who have not been impeached would make trials intolerably tedious, and greatly increase the expense and delay of litigation. Hence, in a civil action, evidence of the general reputation of one of the parties for honesty is not admissible, unless the proceeding is such as to put the character of the party for honesty directly in issue.'' Mattingly v. Shortell, 120 Ky. 52, 85 S. W. 215, 27 Ky. Law Rep. 426, 8 Ann. Cas. 1134.

Giving due weight to these quoted statements of this rule, we entertain no doubt of our conclusion that the court erred in allowing defendant to here introduce the character evidence complained of and that the same was not properly admissible. However, conceding such to be the case, the further question arises as to whether or not its introduction was, under the circumstances and facts before us, to be deemed so prejudicial of the appellant's substantial rights as to warrant a reversal of the judgment. As we have above indicated, we are of the opinion that there was here but one real issue to go before the jury for decision, which was not of character but of fact, as to whether or not the defendant had authorized Hignite to make the note sued on some two years after the admitted termination of the alleged partnership, even if such in fact ever existed.

While the evidence was conflicting as to the defendants having ever formed a partnership, the determination of such question, under the circumstances here appearing, was of very slight if any consequence, the jury's important problem being, under the instructions given it, to determine whether Nantz had consented to or instructed Hignite to make the note sued on after the dissolution of the partnership. Were the evidence heard upon the only material issue in the case of such doubtful character and weight as to have made difficult and doubtful the jury's finding upon this point, it might then be inferred that it was influenced in its finding upon such issue because of the erroneous admission of the good character evidence in favor of defendant. However, we do not conceive that such was here the case or that the improper admission of this character evidence, even though incompetent, would have had, under the circumstances, other than slight, if any, influence upon

the finding of the jury on the one real issue presented in the case. Therefore we are constrained to conclude that its admission was not substantially, if at all, prejudicial to the rights of appellant, and that the judgment of the trial court, given upon the jury's verdict found upon the one real and substantial issue in the case, submitted it under proper instructions, should not be disturbed.

The judgment is therefore affirmed.